UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MARTIN MILANO,

                    Plaintiff,

  -against-                                  **FIRST AMENDED COMPLAINT**

MIDDLETOWN ENLARGED CITY SCHOOL      **JURY TRIAL DEMANDED**
DISTRICT, PETER ANCONA, Director of
Technology, PATRICIA MCLEOD,                       05 Civ. 4526 (LMS)
former Superintendent of Schools, KENNETH      ECF case
EASTWOOD, Superintendent of Schools, VINCENT
CRESCENZO, President of the Board of Education,
sued in their individual capacities,

                    Defendants.
------------------------------------------------------------------X

       By and through his counsel, Thornton, Bergstein & Ullrich LLP, plaintiff complains of defendants as follows:

### I.    INTRODUCTION

       1. Plaintiff Martin Milano brings suit to redress the violation of his rights under the First and Fourteenth Amendments of the United States Constitution, as made actionable by 42 U.S.C. § 1983.

### II.    PARTIES

       2. Plaintiff resides in the County of Orange, State of New York, within this judicial district.

       3. Defendant Middletown Enlarged City School District is a public School District organized pursuant to the laws of the State of New York. It may sue and he sued.

       4. At all relevant times, defendant Peter Ancona was the School District's Director of Technology. His actions in this matter were taken under color of State law.

5.  Defendant Patricia McLeod was Acting Superintendent of Schools from January 9, 2003 through February 2004, when she resigned.  At all prior relevant times, she was the District's Assistant Superintendent for Instruction.  Her actions in this matter were taken under color of State law.

6.  Defendant Kenneth Eastwood has been the District's Superintendent of Schools from July 1, 2004 to present. His actions in this matter were taken under color of State law.

7.  Defendant Vincent Crescenzo has served as President of the Board of Education from June 2004 to present, and prior to that was a Board member.   His actions in this matter were taken under color of State law.

**II.     JURISDICTION**

8.  This Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. secs. 1331, 1343 (3) and (4) and 1367 and 42 U.S.C. secs 1983 and 1988.

**III.    FACTUAL AVERMENTS**

9. Plaintiff Martin Milano has been employed by Middletown Enlarged City School District ("the School District") as a Computer Network Specialist since August 2, 1999.  This position is a non-union Civil Service position.

10.  Before commencing employment with the School District, plaintiff had several years experience working in the technology field.

11.  Throughout his employment, plaintiff has performed his job exceedingly well.  His last performance evaluation, dated January 2002, was absolutely glowing regarding plaintiff's performance.  In his summative comments, defendant Ancona, plaintiff's immediate supervisor, wrote: "Martin is our network system rock.  You can always count on him to give 110%.  He has

never NOT been able to bring systems up that were down or handle the most complicated technology projects with success.  He keeps it all running and running well.  Martin's knowledge of computers, networks, and computer systems is outstanding.  He is an asset to the Technology Department in Middletown and a necessary part of this successful team.  Martin is always someone I can count on, I don't have to ask twice.  Thanks for all you do!"

12. However, shortly after Ancona wrote this highly positive performance review, plaintiff's employment fortunes with the District took a sudden and dramatic turn for the worse.

13. In or about late April 2002, Ancona directed plaintiff to the office of former Superintendent Robert Sigler.  Ancona reported directly to Sigler and was part of his "Superintendent's Cabinet," consisting of high level central administrators.

14. Sigler directed plaintiff to search his computer to find and remove any "porn sites." When plaintiff asked Sigler why he wanted him to do this, Sigler stated that then School Board President Paul Johnson and High School Principal Bernard Cohen were conspiring to remove him from his position and he thought they might send the State police to seize his computer. Sigler then left plaintiff alone in his office.

15. Plaintiff searched through Sigler's computer and located a "jpeg" image attached to Sigler's America Online ("AOL") "buddy list."  The image depicted an adult male torso with an erect penis.

16. Alarmed by this image, plaintiff asked that Ancona join him in Sigler's office. Plaintiff showed Ancona the image and asked Ancona what they should do.  Ancona told plaintiff to erase it.  While plaintiff followed his supervisor's direction, he did not irrevocably delete the image from the hard drive.

17. A few weeks later, on or about May 22, 2002, while performing work at the High School, plaintiff heard two faculty members discussing rumors that Sigler was having "an affair" with a male ninth grade High School student. They asked plaintiff if he knew anything about it. When plaintiff said he had no idea what they were talking about, they identified the boy ("A.G."), whom plaintiff had seen on prior occasions at the central administration offices. The faculty members told plaintiff that Sigler had been observed having dinner with the boy, inviting him to his house and buying him gifts. Plaintiff was shocked, particularly in light of the image he previously saw on Sigler's computer.

18. Plaintiff immediately returned to the administrative offices, told Ancona what he had just heard about Sigler and urged Ancona that they needed to take action regarding the computer image they found on Sigler's computer. Ancona told plaintiff he would "take care of it." Plaintiff then returned to the High School to resume his work there.

19. Within an hour, Ancona ordered plaintiff to return immediately to the central office. Plaintiff was unable to leave immediately, as the High School was in a lockdown during a police search for drugs. When plaintiff arrived, Ancona said that Sigler "wants a name." Shocked and dismayed at Ancona's disclosure to Sigler, plaintiff responded, "You told him?"

20. Ancona then ushered plaintiff into Sigler's office, where they demanded to know who at the High School told him that Sigler was having a sexual relationship with "A.G." When plaintiff refused to give any names, they continued the interrogation, naming various people from the High School and asking if they had spoken to plaintiff. Plaintiff finally said he had not seen the people who had made the statements regarding Sigler, but just heard their voices.

21. Immediately thereafter, Ancona and Sigler began to retaliate against plaintiff.

Plaintiff was stripped of his office and placed in a workspace in the basement, prohibited from leaving the administrative offices and given irregular assignments far less desirable than those he had performed before the confrontation on May 22, 2002.

22. In or about June 2002, Sigler and Ancona directed plaintiff to use his credit card to purchase a software program called "Evidence Eliminator" for Sigler's computer. When plaintiff refused, both Sigler and Ancona again expressed their displeasure with him.

23. On one occasion, plaintiff was present when Ancona and Assistant Superintendent Timothy Conway joked about the pornographic image on Sigler's computer. Ancona referred to the figure as "Big Al." On another occasion, Ancona joked about the image during a departmental lunch.

24. Ancona told plaintiff that he was using his knowledge about the photograph on Sigler's computer for his own personal gain, namely by threatening Sigler with disclosure if Sigler attempted to transfer a secretary in the department away from Ancona.

25. Ancona informally promoted a family friend, Bob Triebeneck, to the position of "Computer Specialist." The School District later placed Triebeneck into this Civil Service position on a provisional basis. Ancona assigned Triebeneck to perform plaintiff's network-related duties.

26. On January 8, 2003, Superintendent Sigler was arrested on charges of child molestation based on his relationship with A.G. This unprecedented event received national news coverage.

27. In the wake of Sigler's arrest, School District employees were summoned by the police for interviewing. After Sigler's arrest, Ancona interrogated plaintiff at least once a day

about what he intended to tell the police. Before his police interview, plaintiff met with the School District's attorney, John Donahue. After meeting with Donahue, Ancona met plaintiff at the door and asked what they had discussed. Plaintiff tried to remain evasive, not wanting to collude in any way with Ancona, who implied that plaintiff should be less than truthful.

28. In mid-January 2003, apparently concerned that plaintiff would expose his culpability in the Sigler matter, Ancona abruptly announced that plaintiff would resume his former network duties. He did so days before the police questioned plaintiff and other District personnel, including Ancona, about Sigler.

29. According to police notes, when interviewed, Ancona initially denied seeing any pornographic image on Sigler's computer. He subsequently recanted and admitted that he saw the image of the unclothed male.

30. After their police interviews, Ancona again hostilely questioned plaintiff about what he had told the police. Plaintiff stated that he had just given "Yes" and "No" answers.

31. On March 7, 2003, plaintiff was subpoenaed to appear as a witness before the Orange Grand Jury in its investigation of the School District's actions and omissions regarding the Sigler matter. Aware that plaintiff was served with the subpoena, Ancona and Conway immediately told him to speak with the attorney hired by the School District, Alan Levine. Just days earlier, the District Attorney ordered Levine to stop his internal "investigation" of the Sigler matter as it was interfering with the District Attorney's investigation. Plaintiff declined to meet with Levine.

32. On March 11, 2003, plaintiff testified for two hours before the Grand Jury. When he got home from testifying, he received a telephone call on his cell phone from Ancona. Ancona

wanted to know what plaintiff had told the Grand Jury. Ancona persisted in questioning plaintiff, before plaintiff cut off the call.

33. Thereafter, Ancona resumed his earlier retaliatory tactics, refusing to allow plaintiff to leave the central offices and assigning him demeaning tasks. He also made it clear that Triebeneck had more authority in the department than plaintiff, although plaintiff was in a higher position, had more seniority and was, according to his 2002 performance evaluation, "our network system rock."

34. In early April 2003, another technology department employee, Craig Hunt, informed plaintiff that Ancona had interrogated him at length concerning what plaintiff told him about his Grand Jury testimony.

35. At the same time, in another attempt to force plaintiff from his position, Ancona hired outside consultants to begin working with the School District's network.

36. In May 2003, plaintiff courageously informed Acting Superintendent McLeod of the retaliation from Ancona. McLeod sided with Ancona and told plaintiff that his "perceptions" were not consistent with reality. She failed to protect plaintiff from Ancona's ongoing hostile retaliation, which, if anything, increased after plaintiff's reporting to McLeod.

37. In response to plaintiff's stated concerns, McLeod and the School District's attorney, Richard Zuckerman, suggested that plaintiff was being "insubordinate" and could be removed from his position.

38. Indeed, McLeod and the Board of Education adopted a policy of intimidation and retaliation regarding the Sigler matter. Those employees who refused to go along with the attempted cover-up of their own failings in the Sigler matter were singled out for retaliation. For

example, in late March 2003, McLeod announced unfounded "anonymous" allegations against High School Principal Bernard Cohen, who had reported his concerns about Sigler to police, McLeod and the Board of Education President before Sigler's arrest. The School District spent the next nine months investigating Cohen before bringing 3020-a charges against him. The School District created an overall atmosphere of fear and intimidation concerning the Sigler matter.

39. In July 2003, Sigler pled guilty to child molestation charges.

40. In December 2003, the Grand Jury released a scathing report indicting the School District's actions and omissions in the Sigler matter. Although the report did not cite any names, it specifically referred to plaintiff's situation and the rebuked his supervisor (Ancona) for allowing him to be subjected him to retaliation after he had appropriately raised concerns about Sigler.

41. In July 2004, defendant Eastwood began as Superintendent.

42. Plaintiff attempted to elicit Eastwood's support regarding his situation with Ancona, informing him of the ongoing mistreatment.

43. Eastwood turned a deaf ear, responding that there was no evidence that plaintiff had been subjected to any retaliation. Subsequently, Eastwood stated publicly that he fully supports the actions of Ancona vis-a-vis plaintiff, characterizing Ancona as an "excellent employee."

44. In March 2005, plaintiff learned that the District was apparently planning to "eliminate" his position under the guise of budget cutting. Plaintiff went public for the first time, relaying his story of whistleblowing and retaliation to the *Times Herald Record.* The resulting story received an outpouring of condemnation against the School District from the community.

45. On April 8, 2005, defendant Crescenzo responded with a "My View" editorial in the *Times Herald Record*. Although plaintiff had never been informed by any District official that his job was subject to elimination, Crescenzo publicly confirmed that the District was eliminating plaintiff's position, purportedly to save money. Apparently viewing litigation as the litmus test for a situation's truthfulness, Crescenzo stated, "if the alleged charges [of retaliation] were true, why hasn't the employee pursued relief through the federal laws protecting alleged whistle-blower." In addition, demonstrating a complete mis-understanding of his own School District's recent history, Crescenzo also wondered why an article about a School District employee losing his job for whistle-blowing would be front-page news "[w]ith all that is going in the world."

46. On May 5, 2005, defendant Eastwood publicly announced that plaintiff was being terminated pursuant to the School District's budget. Eastwood echoed Crescenzo's pretextual justification that this was being done for budgetary reasons.

47. Notwithstanding Crescenzo's editorial and Eastwood's public comments, the District has yet to inform plaintiff that he is being terminated.

48. The above-described employment actions, including plaintiff's apparent termination, have been taken in retaliation for plaintiff's speech and activity protected by the First Amendment to the United States Constitution. Plaintiff's protected speech includes his reporting Sigler's inappropriate relationship with a student, his statements to the police and the District Attorney, his testimony to the Grand Jury, his refusal to illegally collude with Ancona regarding these statements and testimony, and his refusal to cooperate with a District-wide cover up regarding the actions and omissions of School District officials in connection with the Sigler

9

matter, all of which are matters of the utmost public concern.

49. As set forth herein, through the actions of District officials with final policymaking authority with respect to personnel matters, plaintiff has been retaliated against and selectively disciplined in violation of his rights under the First and Fourteenth Amendment.

50. In addition, the School District has established a custom or policy of retaliating against and/or selectively disciplining District employees and volunteers for exercising their First Amendment rights and for other wrongful purpose. This policy or custom has substantially caused the violations of plaintiff's constitutional rights.

51. Moreover, specifically in connection with the Sigler matter, through its elected and appointed leaders, the School District adopted an unconstitutional policy or custom of secrecy, distortion, cover-up, retaliation and vindictive attack concerning a matter of the utmost public importance. This policy or custom has substantially caused the violations of plaintiff's constitutional rights.

52. Through their malicious and reckless acts and omissions, defendants have maliciously and willfully caused plaintiff actual compensatory injuries, including lost pay and promotional opportunities, mental anguish, humiliation, embarrassment, and diminishment of his professional and personal reputation.

52A. The School District terminated plaintiff's employment effective June 30, 2005. In whole or in part, the School District terminated plaintiff's employment because Ancona characterized plaintiff as incompetent, insubordinate and/or having engaged in other misconduct. As plaintiff had a permanent appointment to a competitive class position in the classified service, under New York State Civil Service law § 75, the School District could not terminate plaintiff's

employment for alleged incompetence or misconduct without first bringing disciplinary charges against him and holding a hearing on those charges.

52B.  Before terminating plaintiff's employment, the School District did not bring disciplinary charges against him or hold a hearing pursuant to New York Civil Service Law. Instead, the District justified plaintiff's termination on the sole ground that it was eliminating his position to save the District money, thereby attempting to evade the statutory requirements of disciplinary charges and a hearing.

### IV.  CAUSES OF ACTION

53.  Plaintiff incorporates paras. 1-52 as if fully restated herein.

54.  Defendants have violated plaintiff's rights under the First and Fourteenth Amendments, as made actionable against these defendants pursuant to 42 U.S.C. section 1983.

54A.  As plaintiff had a property right in his continued employment with the District, and defendants did not provide him with due process of law before terminating his employment, defendants violated plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution, as made actionable by 42 U.S.C. § 1983.

### V.  PRAYER FOR RELIEF

55.  WHEREFORE, plaintiff prays that this Honorable Court:

(a) empanel a jury to hear and decide this matter;

(b) award to plaintiff compensatory damages, including damages for lost pay and benefits and past and future emotional distress, against the defendants jointly and severally;

(c) award to plaintiff punitive damages against the individual defendants for their egregious violations of his rights which must be punished and deterred;

(d) award to plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. section 1988,

and

(e) enter any other relief justified by the law and facts.

Dated: January 12, 2006
       Chester, New York

                                     Respectfully submitted,

                      S/_____
                     Christopher D. Watkins (CW 2240)

                     Thornton, Bergstein & Ullrich LLP
                                          15 Railroad Ave.
                               Chester, New York 10918
                                         (845) 469-1277
                                  Attorneys for Plaintiff